# Exhibit D

## SEPARATION AGREEMENT AND RELEASE

This Separation and Release Agreement ("Agreement") is entered into between Verengo, Inc. (herein referred to as the "Company"), and Randy Bishop ("Bishop or "you" ), and is intended to be a full and final resolution of all matters involving Bishop's employment with the Company. Capitalized terms that are not specifically defined in this Agreement shall have such meanings as ascribed to them for purposes of your Employment Agreement, dated January 1, 2013, as amended September 12, 2014 (the "Employment Agreement").

The parties to this Agreement hereby agree to the following:

      1.    **Status of Employment.**  Your final date of employment ("Separation Date") is March 25, 2015.

      2.    **Separation Benefits & Expense Reimbursement.**  In consideration for signing this Agreement and complying with the terms of this Agreement, you will receive, subject to the expiration of the Revocation Period, the payments described in subparagraphs (a) and (b) below (collectively, the "Separation Benefits"):

      (a)    Salary and Bonus. A payment in cash equal to your Salary (as defined in the Employment Agreement) for a twelve (12) month period, plus the Separation Bonus, in each case less applicable state and federal withholdings, payable in equal installments on the Company's normal payroll dates during the twelve (12) month period immediately following such termination (commencing with the first payroll date that is more than forty-five (45) days following the Separation Date) (collectively, the "Separation Payments");

      (b)    The Company and Bishop are parties to that certain Early Exercise Stock Purchase Agreement dated December 20, 2011 (the "SPA") pursuant to which Bishop exercised a Stock Option dated July 31, 2009, as amended, to purchase 2,526,181 shares of Company common stock (the "Option Agreement"). Bishop previously borrowed funds from the Company pursuant to that certain Non-recourse Secured Promissory Note dated September 12, 2014 in the original principal amount of $500,000 (the "Secured Note") and, in connection with the exercise of the option under the Option Agreement, Bishop borrowed funds from the Company pursuant to that certain Unsecured Promissory Note dated December 20, 2011 in the original principal amount of $41,682 (the "Option Note", with the Secured Note, the "Notes"). To secure the Secured Note, the Company and Bishop entered into that certain Stock Pledge Agreement dated as of September 12, 2014 (the "Pledge Agreement", with the Notes, the "Loan Documents"). Pursuant to the Secured Note, the entire amount of accrued but unpaid interest and all outstanding principal thereon shall be due and payable upon termination of Bishop's employment with the Company (regardless of the reason for termination). The parties acknowledge and agree that the total amount of indebtedness, including all accrued but unpaid interest and all outstanding principal on the Notes, is $548,244 (the "Total Indebtedness" and that, upon payment of $548,244, Bishop's obligations to the Company pursuant to the Notes and Loan documents is satisfied in full. The parties acknowledge and agree that all options for the purchase of Company Common Stock and all shares of Company

1

Common Stock currently held by Bishop are fully vested and are no longer subject to any repurchase options in favor of the Company.

3.    **Notes Payoff & Expense Reimbursement.**  As additional consideration for signing this Agreement and complying with the terms of this Agreement, the parties hereby agree as follows, subject to the expiration of the Revocation Period in accordance with Paragraph 14:

(a)    The Company and Bishop hereby agree to the following which shall be in complete satisfaction of Bishop's obligations under the Notes and the Loan Documents, including payment in full of the Total Indebtedness:

(i) in lieu of receipt of the Separation Payments to which Bishop is entitled, the Company shall apply to and offset against the Total Indebtedness the Separation Payments in the amount of $398,125;

(ii) Bishop hereby waives and relinquishes any further right to receive grants of equity interests from the Company, in the form of options or otherwise, arising under Section 11(l) of the Employment Agreement, or otherwise and the Company shall forgive $45,000 of the Total Indebtedness;

(iii) Bishop shall assign and transfer to the Company and the Company shall accept as payment for the balance of Total Indebtedness all of his right, title and interest in 618,347 shares of Company common stock (the "Returned Stock") which the parties agree have a current fair market value of $0.17 per share or $105,119 in the aggregate and the parties shall take such actions as are necessary and appropriate in connection with the foregoing assignment of the Returned Stock to the Company; and

(iv) the Company shall cancel the Notes and Pledge Agreements and release 100% of the Pledged Stock (as defined in the Pledge Agreement) from Option Pledge Agreement, release all liens on the Pledged Stock and shall deliver a stock certificate representing the Pledged Stock retained by Bishop (the "Retained Stock," meaning the Pledged Stock other than the Returned Stock ) issued in the name of Bishop (or, to a family member or trust for the benefit of a family member, as directed by Bishop) and the parties shall take such other actions as are necessary and appropriate in connection with the foregoing release and delivery of the Retained Stock to Bishop.

(b)    Contingent Payments. As a further inducement for your entry into this Agreement, contingent payments, each in the amount of $13,271 ("Contingent Payments") payable for each of the twelve calendar months of 2015 (the "Measurement Period") if, and only if the applicable monthly milestone set forth for such month on Exhibit A hereto shall have been achieved by the Company (for each such month, the "Payment Event"), as determined solely by the Company, which shall be paid in arrears within thirty calendar days following the month for which the Payment Event shall have

2

occurred; provided, however, that no Contingent Payment shall be made with respect to any month where the Payment Event shall not have been satisfied, whereupon the Company's obligation to make a Contingent Payment with respect to that month shall terminate; provided further, that notwithstanding the foregoing, the January 2015 and February 2015 Contingent Payments in the aggregate amount of $26,542 shall be paid to Bishop upon expiration of the Revocation Period.  Without limiting any other remedies available to the Company, the Company may suspend or terminate further payment of the Contingent Payments if Bishop is in material breach of any of his obligations under this Agreement;

      (c)     In addition, if you properly and timely elect to continue medical coverage under the Company's then existing benefits plan in accordance with the continuation requirements of COBRA, the Company shall reimburse you for the cost of the premiums for such coverage, less $27.40 per calendar day (i.e. $10,000 per year) from the Separation Date through the twelve (12) month anniversary of the Separation Date.

      (d)     Vested Options.  As provided for in the Employment Agreement, notwithstanding the terms of any option award or agreement to the contrary, you shall have three (3) years from the Separation date  to exercise any vested, unexercised stock options held by you on the Separation Date.

The parties agree that the Company does not have a legal obligation to pay the Separation Payments and Contingent Payments described above but that it chooses to do so in consideration for your service to the Company and your promises in this Agreement.  You agree that in the event you breach any term of this Agreement, the Company will have no further obligation to pay or provide any unpaid Separation Payments provided by this Agreement.   Provided, however, that nothing in this Paragraph shall limit Company's right to pursue any additional remedies available at law or in equity including, but not limited to, injunctive relief, for your violation of this Agreement.   Despite any breach by you, your other obligations under this Agreement, including your waivers and releases, will remain in full force and effect.

Failure by either party to enforce any term of condition of this Agreement at any time shall not preclude that party from enforcing that provision, or any other provision, at a later time.

    4.     **Modification  of Voting Rights and Proxy; Observer Rights**.  Concurrently with execution of this Agreement, and as a condition precedent to the Company's obligations hereunder,  (i) Bishop hereby resigns from the board of directors of the Company and (ii) Bishop will help to facilitate the resignations of Ken Bishop and Rich Kelley as observers on or prior to the execution of this Agreement.  Bishop further covenants and agrees that Bishop shall not accept any appointment, designation or election to the board of directors of the Company at any time thereafter.  In order to more fully implement the foregoing provisions and promptly upon request of the Company,  Bishop shall (i) execute and deliver, in form and substance acceptable to the Company, an amendment to that certain Third Amended and Restated Voting Agreement dated January 15, 2015, as amended to date, among the Company and the other parties specified therein ("Voting Agreement"), terminating any further rights Bishop may have under Sections 2.2(iv) and 2.2(v) to be appointed, designated or elected as a director or observer of the

3

Company and (ii) his capacity as a Key Holder, reasonably cooperate with the Company as requested by the Company to assist in restructuring the Board to address the resignations of Bishop and Ken Button. The Company agrees as follows: The Company shall give Ken Button, Randy Bishop, Rich Kelley and Ken Bishop (the "Special Information Recipients") copies of all notices, minutes, consents and other materials that it provides to its Board at the same time and in the same manner as provided to the Board; provided, however, that such Special Information Recipients shall agree to hold in confidence and trust all information so provided; and provided further, that the Company reserves the right to exclude the Special Information Recipients from access to any material (A) if the Company's Board determines, in good faith, upon advice of counsel, that such exclusion is reasonably necessary to preserve the attorney-client privilege, or (B) if the Company's Board determines, in good faith, that such exclusion is reasonably necessary to protect highly confidential proprietary information of the Company. The Special Information Recipients may also examine the books and records of the Company and inspect its facilities and may request information at reasonable times and intervals concerning the general status of the Company's financial condition and operations, provided that access to highly confidential proprietary information and facilities need not be provided and access may be denied to preserve the attorney-client privilege.

    (b)    Option and Proxy Matters. The Company and Bishop agree to the following amendments and actions related to the Option Agreement and the SPA:

    (i)    Section 12 (Mandatory Voting) of the Option Agreement is hereby omitted in its entirety and is no longer of any force and effect;

    (ii)    Section 13 (Irrevocable Proxy) of the Option Agreement is hereby amended to provide that the proxy grant is limited to a right to vote Bishop's shares of Common Stock in compliance with the take-along provisions set forth at Section 14 of the Option Agreement and only in the event that Bishop fails to vote his shares of Common Stock in accordance with such take-along provisions;

    (iii)    Section 17 of the SPA is hereby amended to eliminate any reference to the "Mandatory Voting" provisions of the Option Agreement; and

    (iv)    The stock certificates and any related assignments of certificates held by the Escrow Agent (as defined in the SPA) pursuant to Section 8 of the SPA and the Joint Escrow Instructions executed in connection with the SPA shall be released from escrow and delivered to Bishop.

    5.    **Return of Property.** Except as reasonably required to provide ongoing services to the Company for a transition period pursuant to a mutually agreed upon separate services agreement between Bishop or BearTree Partners LLC ("BearTree") and the Company, you represent that you have returned to the Company all Company-owned or leased property or documents in your possession or under your control and you further agree that you will not retain any copies or duplicates of any such Company property. Notwithstanding the foregoing, and in addition to your continuing rights under Paragraph 6 below, Bishop shall be permitted to retain the iPad and cell phone previously provided to him by the Company.

4

6. **Continuing Obligations**.

(a)     You acknowledge that the Non-Disclosure and Confidentiality Agreement you entered into with the Company at the time of your employment is still in effect for a period of one (1) year after the separation of your employment.  You understand your obligations under the Non-Disclosure Agreement and will comply with all of your obligations under the Non-Disclosure Agreement.

(b)     During your employment by the Company you have had access to and have become familiar with the Company's operations, procedures, computer systems, sales related information, customer information, pricing techniques, methods of doing business, marketing plans, financial and accounting information, salary and benefit information and other confidential information which is regularly used in the operation of the Company's business, but is not within the public domain.  For the purposes of this Agreement all such information is collectively referred to as the "Confidential Information".  You acknowledge and agree that the Confidential Information is a valuable, special and unique asset of the Company, the disclosure or use of which could cause substantial injury and loss of profits and good will to the Company.  Accordingly, you will not directly or indirectly in any way use or disclose any of the Confidential Information.

(c)     Except as permitted in Paragraph 6(e) below, or as reasonably required to provide ongoing services to the Company for a transition period pursuant to a mutually agreed upon separate services agreement between Bishop or BearTree and the Company, you also agree that you will not access the Company's computer systems, download files or information from the Company's computer systems or in any way interfere, disrupt, modify or change any computer program used by the Company or any data stored on the Company's computer systems.

(d)     The Company acknowledges that it has adopted  bylaws which provide for the indemnification of the officers and directors of the Company to the maximum extent authorized by the Delaware General Corporation Law (Indemnification Right") and that the Company maintains directors' and officers' liability insurance ("D&O Insurance") covering certain liabilities which may be incurred by its officers or directors in the performance of their obligations to the Company.  This Indemnification Right, and the right to coverage pursuant to the D&O Insurance, shall continue during the period you are an officer or director of the Company (or is or was serving at the request of the Company as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise) and shall continue thereafter so long as you shall be subject to any proceeding by reason of your having been an officer or director of the Company, whether or not you are acting or serving in any such capacity at the time any liability or expense is incurred.  This Paragraph 6(d) shall continue in effect regardless of whether you continue to serve as an officer or director of the Company or any other enterprise at the Company's request.,

(e)     Until the close of business on March 25, 2016, the Company shall cause Bishop's e-mail address, rbishop@verengosolar.com and rbishop@goverengo.com to remain active, provided that Bishop shall refer to himself as a "Founder" and will  promptly  forward or

5

refer emails he receives that relate to the Company's business to a person designated by the Company.

      (f)    The Company will reasonably cooperate in the transfer back to BearTree Partners LLC ("BearTree") of BearTree's domain name and email address which are currently held by the Company.

      (g)    The Company agrees to cooperate with BearTree in the proposed dissolutions of the BTE Group, LLC, BTE Investors, LLC, Verengo B Investors, LLC, Verengo B-1 Investors, LLC, Verengo B-3 Investors, LLC and Verengo B-4 Investors (collectively, the "LLC Investors") and the distribution of the shares of Company stock held by each such LLC Investor to their respective members in dissolution. Until the LLC Investors are dissolved, the Company will (x) continue to provide administrative services and support in the same manner that it has previously provided for the LLC Investors and (ii) reimburse BearTree for reasonable out-of-pocket expenses to complete the distribution/dissolution process.

      (h)    The Company shall reimburse Bishop and Ken Button jointly for up to Seven Thousand Five Hundred dollars ($7,500) in out of pocket legal expenses which they incur in connection with the preparation and finalization of this Agreement, the similar agreement being prepared for Mr. Button and any related documents upon provision of suitable documents supporting the incurrence of such legal expenses.

    7.    **Non-Solicitation.** For a period of twelve (12) months after receiving this Agreement, you have not and will not, directly or indirectly, seek or solicit patronage from or interfere (in a manner that is materially detrimental to the Company) with the Company's relationships with any of the following:

      (a)    Any customer, vendor or sales prospect of the Company using Confidential Information of the Company.

      (b)    Any existing employee of the Company for the purpose of encouraging them to end or adversely change their relationship with the Company.

    8.    **Waiver and Release.** In exchange for the Separation Benefits and Contingent Payments and other benefits under Paragraph 3, the Company will provide you under this Agreement, you hereby waive, release and forever discharge the Company, its respective parents, predecessors-in-interest, successors, assigns, subsidiaries, and each and all of their respective partners, principals, assignors, assignees, trusts, agents, directors, officers, shareholders, employees, attorneys, and accountants (whether any of these be past, present or future) from any and all manner of claims, suits, causes of action, in law or in equity, debts, liens, contracts, agreements, promises, warranties, liabilities, damages, losses, costs, interest or expenses of any nature whatsoever, whether known or unknown, which have arisen through the date you sign this Agreement, relating to your employment with the Company or your separation of employment including, but not limited to, any and all claims under Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, the Civil Rights Act of 1966, the Age Discrimination In Employment Act ("ADEA"), the Employee Retirement Income Security Act of 1974, the National Labor Relations Act, the Americans with Disabilities Act of 1990, the Fair Credit

Reporting Act, the Sarbanes-Oxley Act, as amended, the Dodd-Frank Wall Street Reform and Consumer Protection Act, the Family and Medical Leave Act, the Equal Pay Act, the California Fair Employment and Housing Act, the California Family Rights Act, the California Labor Code, and under any other federal, state or local law, statute, ordinance, guideline, regulation, order and under common law including, but not limited to, claims of breach of contract, and whether for back pay, damages, and any other relief at law or in equity, including claims for attorney's fees. You further covenant and agree never to institute directly or indirectly or to participate (unless otherwise required by law) in any action or proceeding of any kind against the Company, its directors, officers, agents, and/or employees, based on or related to your employment relationship with the Company, including, but not limited to, an action asserting that the Company discriminated against you on the basis of race, age, sex or any other protected classification, or an action asserting a breach of contract. Notwithstanding the foregoing, nothing in this Agreement shall prevent you from filing a charge with any federal, state or administrative agency, such as the Equal Employment Opportunity Commission, or from cooperating with that agency in any investigation or proceeding, but you agree not to participate in, and waive your rights with respect to, any monetary or financial relief arising from any such proceeding that relates to the matters released by this Agreement. This release does not affect (i) your rights, if any, to vested benefits such as retirement or 401(k) and (ii) your rights to be indemnified by the Company against third party claims that relate to your employment by the Company.

You further agree to waive all rights under Section 1542 of the Civil Code of the State of California, up to and including the date you sign this agreement. Section 1542 provides as follows:

> *"A general release does not extend to claims which a creditor does not know of or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."*

You further agree and represent that you have had an opportunity to consult with an attorney over the meaning and significance of this Civil Code §1542 waiver and that you knowingly and voluntarily waive your rights under that statute.

9.    **Covenant Not To Sue.**  You have not, at any time up to and including the date on which you sign this Agreement, commenced, and will not in the future commence, to the full extent permitted by law, any action or proceeding, or file any action, of any nature arising out of the matters released by Paragraph 8, and you waive to the full extent permitted by law, any right to any monetary or equitable relief in any proceeding that may relate to the matters released by Paragraph 8. Nothing in this Paragraph 9 will preclude either party from bringing a claim to enforce this Agreement.

10.    **Confidentiality of this Agreement.**

You have not and will not discuss or otherwise reveal to anyone the existence or terms of this Agreement or discussions with any authorized Company representative about it, except when necessary to enforce this Agreement or required by law, or after obtaining their agreement

7

to keep all such information confidential, to your attorneys, financial advisors, or accountants or immediate family member. Notwithstanding the foregoing, the Company and Bishop will use all reasonable efforts, acting in good faith, to agree upon the text of a press release announcing the appointment of the Company's new CEO which is satisfactory to the Company and Bishop and, once agreed upon, either party shall be entitled to disseminate such press release.

11. **Cooperation with Legal Proceedings.** Upon reasonable notice, you will provide information and proper assistance to the Company (including truthful testimony and document production) in any litigation or potential litigation in which you are, or may be, a witness, or as to which you possess, or may possess, relevant information. The Company will pay your reasonable expenses incurred in complying with this Paragraph.

12. **Acknowledgements.**

(a) Except for the amounts payable under this Agreement, you acknowledge and represent that the Company has paid you all salary, wages, bonuses, earned unused paid time off, expense reimbursement and any and all other benefits and compensation due to you up to the Separation Date.

(b) You acknowledge and represent that during your employment and through the date you sign this Agreement, you have made full and truthful disclosures to the Company about any unlawful conduct of which you are actually aware by the Company or any of its employees, officers, directors or consultants on behalf of the Company.

13. **Non-Disparagement.** Since receiving a copy of this Agreement, Bishop and the Senior Executives of the Company have not, and agree that such individuals will not, make any statements (oral or written) materially detrimental to the interests of the Company or Bishop including, without limitation, negatively commenting on, disparaging, or calling into question the business operations, reputation or conduct of the Company or Bishop's or the Company's past or present clients, shareholders, directors, executives, officers, employees or agents.

14. **Notice of Revocation Periods.** You acknowledge that you were advised that you could take up to twenty-one (21) days from the date this Agreement was given to you to review this Agreement and decide whether you would enter into this Agreement. To the extent that you have elected to enter into this Agreement prior to such time, you have done so voluntarily, and have knowingly waived such twenty-one (21) day review period.

You may revoke this Agreement within a period of seven (7) calendar days after its execution (the "Revocation Period"), by delivery of a written notice of revocation (the "Revocation Notice") prior to 5:00 p.m. on the last day comprising the Revocation Period to Jamie Yang, Verengo, Inc., Human Resources Director, 20285 S. Western Ave., Suite #200, Torrance, CA 90501. This Agreement shall become irrevocable automatically upon the expiration of the Revocation Period if you do not revoke it in the aforesaid manner. In the event that you revoke the Agreement, or you file a legal action as plaintiff to declare this Agreement unenforceable and such claim is successful and this Agreement is, as a result of said legal action, held to be unenforceable, all checks, instruments, funds, or other such payments received by you

8

pursuant to the terms of this Agreement shall immediately be returned to the Company, and this Agreement shall be deemed void and unenforceable for all purposes.

15. **No Admission of Wrongdoing.** This Agreement shall not in any way be construed as an admission by either the Company or Bishop that it or he has violated any law or acted wrongfully with respect to the other party or any other person.

16. **Entire Agreement/Modification/Interpretation.** This Agreement sets forth the entire agreement between the parties and fully supersedes any and all prior agreements or understandings between the parties regarding the subjects in this Agreement. No change or modification of this Agreement shall be valid or binding upon the parties unless such change or modification is in writing and signed by the parties.

17. **Nature of Agreement.** You have reviewed the terms of this Agreement and have had an opportunity to confer with legal counsel and other advisors of your own choosing with respect to the terms of this Agreement. You acknowledge that you have entered into this Agreement freely and voluntarily. You agree and understand that nothing in this Agreement is an admission by the Company of any liability or unlawful conduct whatsoever. The terms described in this Agreement constitute the entire agreement between you and the Company and may not be altered or modified other than in writing signed by you and the Company. No promise, inducement or agreement not expressed herein has been made to you in connection with this Agreement, and this Agreement supersedes all prior written or oral agreements, arrangements, communications, commitments or obligations between yourself and the Company. This Agreement may only be modified or amended by virtue of a writing signed by both you and the Company.

This Agreement shall be construed and enforced pursuant to the laws of California applicable to contracts to be performed wholly within the State.

You also acknowledge that you fully understand your right to discuss this Agreement with an attorney, that the Company has advised you of this right and encouraged you to do so, that you have carefully read and fully understand this entire Agreement, and that you are voluntarily entering into this Agreement.

17. **Arbitration.** Any and all disputes or claims arising out of or in any way related to Executive's employment with the Company or regarding this Agreement, including without limitation, fraud in the inducement of this Agreement, or relating to the general validity of enforceability of this Agreement, shall be resolved through binding arbitration as provided in Paragraph 11(i) of the Employment Agreement.

18. **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, all of which together shall constitute one and the same instrument.

If the above sets forth our agreement as you understand it and consent to it, please so signify by executing the enclosed copy of this Agreement and returning it to me.

9

I have read, understand, agree and accept the terms and conditions of this Separation and Release Agreement as set forth above.

_____

Randy Bishop

Date: _____March 26_____, 2015

The terms and conditions of this Separation and Release Agreement are accepted by the Company.

By:_____

Date: _____4 / 1_____, 2015          Anders Dahl CEO

10

## EXHIBIT A

### MONTHLY MILESTONES

|  | Feb. 2015 | Mar. 2015 | Apr. 2015 | May 2015 | Jun. 2015 | Jul. 2015 | Aug. 2015 | Sep. 2015 | Oct. 2015 | Nov. 2015 | Dec. 2015 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue:[1] | $6,500 | $7,500 | $8,500 | $10,000 | $12,000 | $13,000 | $14,200 | $16,000 | $17,000 | $17,800 | $17,500 |
| Installation Costs:[2] | $2.95 | $2.85 | $2.75 | $2.70 | $2.65 | $2.60 | $2.55 | $2.50 | $2.48 | $2.47 | $2.46 |

Notes:
1.  In $000s.  Net of customer discounts, rebates, and other adjustments.
2.  Installation costs include direct materials, direct labor, adders, and indirect costs. Presented in dollars per watt installed for the month indicated.  Installation costs are for southern California only.

314303760.2